■ JOHN SAMUELSEN, as President of Local 100, Transport Workers Union of Greater New York, Appellant, v NEW YORK CITY TRANSIT AUTHORITY, Also Known as MTA NEW YORK CITY TRANSIT, et al., Respondents. [957 NYS2d 27]—

Plaintiff is the president of Local 100, Transport Workers

Union of Greater New York (the Union). The Union is the exclusive collective bargaining representative of approximately 32,000 workers employed by various subordinate bodies and affiliates of the Metropolitan Transportation Authority, including defendants, New York City Transit Authority (TA) and Manhattan and Bronx Surface Transit Authority (MaBSTOA). MaBSTOA was created by the legislature in 1962, after the City of New York seized several privately owned and operated bus lines through its eminent domain power. Public Authorities Law § 1203-a (2) was the enabling legislation that allowed the condemned assets to be conveyed to the new authority, a subsidiary corporation of the TA. The status of officers and employees of MaBSTOA was addressed in Public Authorities Law § 1203-a, the subject of this dispute. It provided, in pertinent part: "Said officers and employees shall not become, for any purpose, employees of the city or of the [TA] and shall not acquire civil service status or become members of the New York city employees' retirement system" (NYCERS) (Public Authorities Law § 1203-a [3] [b]).

Although the arrangement outlined above was originally intended to operate "for a temporary period" (Public Authorities Law § 1203-a [2]), it has continued for 50 years. Over the years, the two authorities have remained separate legal entities. Indeed, the TA is extremely vigilant against efforts to recover from it tort damages arising out of accidents caused by MaBSTOA operators and equipment. Nevertheless, the two organizations have developed, as a practical matter, functional overlap. For example, they share common resources, such as office facilities and a personnel department.

From 1999 to 2002, the terms of employment for both TA and MaBSTOA employees were governed by a collective bargaining agreement (CBA) that provided that any layoffs of MaBSTOA employees would occur in reverse order of seniority, based upon date of hire. There was no similar provision in that agreement concerning TA workers, because their layoffs were governed by the Civil Service Law. Also under the terms of the CBA, MaBSTOA employees could pick only jobs associated with the bus lines operated by MaBSTOA, and TA employees could pick only jobs associated with bus lines and subways operated by the TA.

In December 2002, the TA and MaBSTOA executed a "Memorandum of Understanding" with the Union (the MOU), which, inter alia, modified the CBA to provide for the consolidation of MaBSTOA and TA surface transit operations. The MOU, also referred to as "Attachment E," provided, in pertinent part:

"The Authority and the Union agree to the elimination of the artificial distinction between MaBSTOA and the Transit Authority. To that end, the parties agree as follows:

"(1) Effective 90 days after final ratification all impediments to the free movement and commingling of equipment and personnel between MaBSTOA and Transit Authority shall be eliminated except as modified herein or by agreement of the parties.

"(2) Effective that same day, all contractual pay and work practices at MaBSTOA shall be standardized at the Transit Authority level . . .

"(3) Employees hired after the effective date of this agreement will be hired in the same ratio as the prior three-year average (Civil Service/Non-Civil Service Ratio). The ratio shall be established for each covered title."

In August 2003, the parties executed a consolidation agreement, which created uniform probationary employment rules, a uniform disciplinary system, and uniform sick leave rules. It resolved various problems that had arisen in the course of consolidating the TA and MaBSTOA surface transit employees. To further effectuate the MOU, the parties established a joint job pick procedure, which allowed MaBSTOA employees to "pick into" TA jobs and TA employees to "pick into" MaBSTOA jobs. Under this new procedure, employees of each authority would pick their jobs in an order established by a single, integrated seniority list, known as the "Consolidated Seniority List." Employees hired prior to December 2, 2004, were "grandfathered in," to the extent that MaBSTOA workers had first pick of "MaBSTOA" jobs before those jobs were made available to TA employees, and vice versa. Employees hired into either Authority after December 2, 2004 picked from any available job, regardless of whether it was a TA job or a MaBSTOA job.

The complaint alleges that "as a result of" the MOU and the consolidation agreement, "employees of [MaBSTOA] are, for almost all purposes, employees of [the TA]. [MaBSTOA] employees regularly work in [TA] facilities; they receive job assignments, direction and supervision from [TA] supervisors. [MaBSTOA] employees are disciplined and in some cases terminated by [TA] officials. [MaBSTOA] employees are paid from an account maintained by the [TA]. Other than not having civil service status or participating in a different pension system, [MaBSTOA] employees working for [TA] are for all purposes indistinguishable from [TA] employees." Plaintiff asserts that this directly violates the prohibition in Public Authorities Law § 1203-a (3) (b) against MaBSTOA employees becoming, "for

any purpose, employees of the city or of the [TA]." Plaintiff seeks a judgment declaring that no MaBSTOA employee may be treated as an employee of the TA for any purpose, and that the MOU and consolidation agreement are void and unenforceable to the extent that they have effectively made employees of MaBSTOA into employees of the TA. Plaintiff further seeks a judgment restraining defendants from taking any action in accordance with the 2002 MOU and 2003 consolidation agreement that is prohibited under the Public Authorities Law, or that adversely affects the employment of any employee of MaBSTOA.

Defendants moved, pursuant to CPLR 3211 (a) (1), (2), (4) and (7) for an order dismissing the complaint. In support of their motion, defendants argued that, since the parties' agreements are valid on their face and enforceable, plaintiff failed to state a cause of action. In addition, defendants argued that, since the Union had reaped the benefit of the agreements, it was equitably estopped from suing to invalidate them. Defendants also invoked the doctrine of judicial estoppel, which was based on the fact that in two CPLR article 75 proceedings, the Union had sought to enforce the agreements. Defendants also contended that the action was barred by operation of the statute of limitations and laches. Finally, defendants sought a change of venue to Kings County, where an appeal from one of the article 75 proceedings was still pending.

The motion court rejected defendants' estoppel and procedural arguments. However, the court dismissed the complaint, finding that it failed to state a cause of action because nothing in the MOU or consolidation agreement indicated that MaBSTOA employees would gain civil service status or become members of NYCERS.

In interpreting any statute, we are required, first and foremost, to pay heed to the intent of the legislature, as reflected by the plain language of the text (*see Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). In addition, "[i]n construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning" (*id.* [internal quotation marks omitted]).

We are also mindful of the fact that the issues herein are presented on a motion to dismiss pursuant to CPLR 3211. Accordingly, the pleading is to be afforded a liberal construction, the facts alleged in the complaint are to be accepted as true, and plaintiff is to be accorded the benefit of every possible favorable inference (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]).

Again, the language we are required to interpret is as follows: "[MaBSTOA] officers and employees shall not become, for any purpose, employees of the city or of the [TA] and shall not acquire civil service status or become members of [NYCERS]" (Public Authorities Law § 1203-a [3] [b]). In our view, this plainly means that three separate prohibitions apply to MaBSTOA employees: (1) that they "shall not become, for any purpose," employees of the TA; *and* (2) that they shall not acquire civil service status; *and* (3) that they shall not become members of NYCERS. Accordingly, we agree with the Union that, to the extent that the MOU and consolidation agreement, by merging many of the policies of the two authorities, such as probationary employment rules, disciplinary rules, and sick-leave rules, transform MaBSTOA employees into employees of the TA, the agreements violate the first prohibition.

Defendants argue that the Union's interpretation of the statute is wrong. However, in doing so, they never account for the fact that the "shall not become, for any purpose" clause stands distinctly apart from the other two clauses in the provision. Rather, they posit that "[t]he plain and obvious meaning of the 'for any purpose' language is to ensure that a MaBSTOA employee cannot, simply by virtue of employment by MaBSTOA, even in a contractually agreed upon commingled work force, acquire civil service status or membership in NYCERS." The most glaring problem with this interpretation of course is that it is decidedly not what the statute says. The way the provision is written, the "and" creates a separation between the "for any purpose" clause and the rest of the sentence. It does not signal a modification to the "for any purpose" clause or in any way refer back to it. Furthermore, defendants' interpretation renders the first prohibition superfluous, a result which "is to be avoided" (*Matter of Branford House v Michetti*, 81 NY2d 681, 688 [1993]).

In addition, defendants' interpretation of the statute, with which the dissent agrees, would essentially substitute the phrase "for *all possible* purposes" for the words that are actually employed, "for any purposes." In other words, defendants argue that if a MaBSTOA employee cannot, under any circumstances, be subject to the Civil Service Law or participate in NYCERS, they simply cannot be considered TA "employees," rendering the first clause meaningless if not considered in the manner they urge. This approach is too narrow, for it pays no heed to the notion that different people working under the same employer can be classified differently. In other words, not every employee in an organization is similarly situated. Here, the

statute recognizes that MaBSTOA workers could become so integrated into the TA organization that they could be seen as TA employees, albeit without the protections of the Civil Service Law and the benefit of NYCERS participation. We simply discern nothing in the statutory language which confirms, as the dissent insists, that Civil Service Law protection is the "distinguishing" or "hallmark" quality of TA employment.

Contrary to the dissent's observation, this approach is not in conflict with other provisions in the Public Authorities Law that might be interpreted as encouraging some standardization of the two agencies' operations. None of the sections which the dissent cites (i.e., Public Authorities Law § 1204 [11], [15] and [17]) authorize MaBSTOA employees to take on qualities of being "employed" by the TA. Further, while Public Authorities Law § 1203-a (3) (d) authorizes MaBSTOA to "borrow" TA employees, there is no reciprocal provision. Since these sections have nothing to do with the nature of MaBSTOA employment, we fail to understand the dissent's statement that our position creates "ambiguity" as to when MaBSTOA employees can be considered de facto employees of the TA.

Because we agree with the Union's interpretation of Public Authorities Law § 1203-a (3) (b), and because the complaint sufficiently alleged facts establishing that the MOU and consolidation agreement had the effect of conferring on MaBSTOA workers qualities of "employment" by the TA, the motion court erred in dismissing the complaint as not having stated a cause of action.

We have considered defendants' other arguments for dismissal and find them unavailing. Concur—Mazzarelli, J.P., Renwick and Manzanet-Daniels, JJ.

Catterson and Abdus-Salaam, JJ., dissent in a memorandum by Catterson, J., as follows: I must respectfully dissent. There are fundamental differences arising out of the civil service protections accruing to New York City Transit Authority (hereinafter referred to as TA) employees in crucial areas of employment, namely hiring, promotion, suspension, termination and retirement pensions. Manhattan and Bronx Surface Transit Operating Authority (hereinafter referred to as MaBSTOA) employees do not and cannot enjoy the same civil service protections, and as set forth more fully below, the 2002 memorandum of understanding (hereinafter referred to as the 2002 MOU) and 2003 implementation agreement do not purport to imbue MaBSTOA employees with such civil service benefits. Despite these differences, the majority is in agreement with the plaintiff that MaBSTOA employees are "indistinguishable" from TA em-

ployees except for "not having civil service status or participating in a different pension system." This is, in my opinion, simply incomprehensible. These differences, which the majority dismisses summarily, go to the very crux of the issue on appeal.

In my opinion, the majority is incorrect in holding that MaBSTOA employees are transformed into TA employees in violation of the Public Authorities Law[1] on the ground that the 2003 implementation agreement merged "many of the policies of the two authorities, such as probationary employment rules, disciplinary rules, and sick-leave rules." It is axiomatic that just because MaBSTOA employees are treated *similarly* to TA employees with respect to some areas of employment they do not *become* TA employees with all the statutory protections of the Civil Service Law. Indeed, there is no prohibition in the statute against MaBSTOA employees gaining benefits like additional sick days (identical to the sick days accorded to TA employees) when those extra sick days are gained by negotiation and collective bargaining specifically on behalf of MaBSTOA employees. The prohibition is against MaBSTOA employees gaining additional sick days just by virtue of employment in a TA job or location.

The plaintiff points specifically to the provision of the collective bargaining agreement (hereinafter referred to as CBA) which allows MaBSTOA employees to "pick" into TA jobs pursuant to a single integrated seniority list of employees from both entities. The plaintiff asserts that this violates section 1203-a (3) (b) of the Public Authorities Law, which, in relevant part, states that a MaBSTOA employee "shall not become, for any purpose, [an] employee[ ] of . . . the transit authority." Stated simply, the plaintiff's claim is that a MaBSTOA bus operator who picks a route and/or location in TA territory becomes a TA employee notwithstanding that the employee is vested with no other indicia of TA employee status.

However, the plain language of the statute does not prohibit a MaBSTOA employee "picking" into a TA job because such "picking" of a TA route or location does not alter the employment status of a MaBSTOA employee. As the defendants assert, there is "no ambiguity about the language or the legislative intent" of the provisions: the provisions are intended to preserve the fundamental distinction in the nature of the employment relationship.

---

**1.** It is noteworthy that the plaintiff was not only a sophisticated party in the negotiations that resulted in the collective bargaining agreement in 2002, but has for the last 10 years reaped, for its members, such benefits of the collective bargaining agreement as suited the plaintiff.

The plaintiff fails to allege any indicia of TA employment that attach to a MaBSTOA employee "picking into" a TA job. Indeed, the plaintiff makes no allegation whatsoever that, by "picking" into a TA job, a MaBSTOA employee becomes *for the purpose* of promotion, termination or suspension a TA employee who is protected in those critical employment situations by the Civil Service Law.

The following facts are also undisputed: The plaintiff John Samuelsen is the president of Local 100, Transport Workers Union of Greater New York (hereinafter referred to as TWU). TWU represents, for collective bargaining purposes, approximately 32,000 workers employed by various subordinate bodies and affiliates of the Metropolitan Transportation Authority (hereinafter referred to as MTA), including the TA and MaBSTOA.

The defendant TA is a public benefit corporation organized and existing under the Public Authorities Law to provide, inter alia, public bus service in the City of New York. (*See* Public Authorities Law, art 5, tit 9, § 1200 *et seq.*) TA bus operators are appointed pursuant to the requirements of the Civil Service Law, and, as competitive employees, must take and pass a civil service examination. The Department of Citywide Administrative Services (hereinafter referred to as DCAS) places those who pass the examination on an eligibility list. Pursuant to the Civil Service Law, the TA is required to appoint employees from that list.

The defendant MaBSTOA is also a public benefit corporation, organized and existing under the Public Authorities Law, and it is a statutory subsidiary of the TA. (*See* Public Authorities Law § 1203-a [2].) Unlike TA bus operators, MaBSTOA bus operators are employed at will and their employment is not subject to the Civil Service Law.

Although TWU represents both TA civil service bus operators and MaBSTOA non-civil service bus operators, it has, for many years, negotiated a single CBA for its members addressing wages, working conditions, job picks, discipline and other work-related issues. The last complete CBA negotiated between the TWU, TA and MaBSTOA was executed in 1999.

In December 2002, the TWU executed the 2002 MOU, which amended, modified, and became part of the 1999 CBA. The parties negotiated and settled issues such as wage increases, lump sum payments and health benefits. The "Surface Consolidation" provision in the 2002 MOU states, in pertinent part, that "the artificial distinction between MaBSTOA and the Transit Authority" is eliminated, "impediments to the free movement

and commingling of equipment and personnel between MaBSTOA and Transit Authority shall be eliminated," and "contractual pay and work practices at MaBSTOA shall be standardized." On August 25, 2003, the parties executed the 2003 implementation agreement, which addressed probationary employment, disciplinary procedures, and sick leave, and delineated the manner in which the 2002 MOU would be implemented.

Shortly after execution of the 2003 implementation agreement, the parties established a joint job "pick" procedure that lies at the heart of this dispute. Under the new "pick" procedure, MaBSTOA employees could pick into TA jobs and TA employees could pick into MaBSTOA jobs from a single integrated seniority list. For employees of both authorities hired prior to December 2, 2004, MaBSTOA employees had first pick of MaBSTOA jobs and TA employees had first pick of TA jobs. Employees hired into either authority after that date pick from any available job regardless of whether it is a TA or MaBSTOA job.

On July 26, 2010, eight years after its negotiation, ratification and implementation, the plaintiff commenced the instant action seeking a judgment declaring portions of the 1999 CBA void and unenforceable, and preventing the defendants from taking any action in accordance with the 2002 MOU and 2003 implementation agreement, or any action that adversely affects the employment of any MaBSTOA employee.

The plaintiff alleges that as a result of the "Surface Consolidation" provision of the 2002 MOU, also known as attachment E, and the 2003 implementation agreement, MaBSTOA employees have "become" de facto TA employees in violation of Public Authorities Law § 1203-a (3) (b) which states that "[s]aid officers and employees [of MaBSTOA] shall not become, for any purpose, employees of the city or of the transit authority and shall not acquire civil service status or become members of the New York city employees' retirement system [(NYCERS)]."

On September 24, 2010, the defendants moved, pursuant to CPLR 3211 (a) (1), (2), (4) and (7), for an order dismissing the complaint. The defendants argued that although the agreements facilitate the integration of the two entities, MaBSTOA and TA remain legally separate. By decision and order dated May 16, 2011, Supreme Court dismissed the complaint, and the plaintiff appealed. I would affirm the dismissal for the reasons that follow.

The gravamen of the plaintiff's complaint is that as a result of the consolidated job pick procedure, "[MaBSTOA] employees

working for [TA] are for all purposes indistinguishable from [TA] employees." The plaintiff alleges that because MaBSTOA employees work in TA facilities, receive TA job assignments, and are supervised, disciplined and sometimes terminated by TA officials, that they have "become" TA employees. The majority agrees, finding that to the extent that the 2003 implementation agreement applies TA "probationary employment rules, disciplinary rules, and sick-leave rules" to MaBSTOA employees, they are "transform[ed]" into TA employees.

However, the 2003 implementation agreement applies to *all* MaBSTOA employees. Thus, in finding that the agreement is unenforceable, the majority appears to necessarily conclude that *MaBSTOA employees in MaBSTOA positions* have also been "transform[ed]" and can "be seen as TA employees" as a result of these "rules." In my opinion, the majority arrives at this conclusion because it fails to recognize that the distinguishing "qualit[y] of being 'employed' by the TA" is not the additional number of sick days, the length of the probationary period, or the disciplinary grievance steps, which were negotiated for MaBSTOA employees. Benefits which are negotiated by the union for MaBSTOA employees do not transform them into TA employees where the "distinguishing" quality of TA employment is protection by the Civil Service Law in hiring, promotions, suspensions and termination.

For example, although the plaintiff alleges that as a result of the integration a TA official may terminate a MaBSTOA employee in a TA position, there is no allegation that the termination is in accordance with the Civil Service Law, which is applicable to TA employees in the same position. MaBSTOA employees are at-will employees and even if terminated by a TA supervisor the termination is of an at-will employee with no protections other than those agreed upon in the CBA.

As a corollary, the section of the CBA related to TA employees does not include termination or suspension provisions because terminations and suspensions of civil service employees are governed by Civil Service Law § 75. Under the Civil Service Law, TA employees enjoy significant protections with regard to disciplinary proceedings and termination that the 2003 implementation agreement does not grant to MaBSTOA employees.[2]

---

2. For example, section 75 limits the grounds for termination of a civil service employee to "incompetency or misconduct," grants the right to a hearing and representation, and requires that the TA bear the burden of proof in an disciplinary proceeding. (Civil Service Law § 75 [1], [2].) Furthermore, the Civil Service Law limits the time for suspension without pay to 30 days, speci-

Thus, although the 2003 implementation agreement eliminates one step of the grievance process for MaBSTOA employees and provides for MaBSTOA's use of the same pool of arbitrators as the TA, the agreement does not transform them into TA employees with the same civil service benefits.

Likewise, layoffs of TA bus operators are governed by Civil Service Law § 80, which requires that provisional employees must be laid off first, then probationary employees in inverse order of civil service seniority, and then permanent employees in the affected title in inverse order of civil service seniority. The layoff lists for civil service employees are prepared and provided by DCAS in accordance with section 80, and include additional seniority credit for certain employees, including veterans and disabled veterans. Seniority for layoffs is generally based on eligibility lists and date of continuous permanent appointment in the civil service of the governmental jurisdiction in which the reduction occurs. Layoff of MaBSTOA employees, however, is governed by the CBA, and the seniority list is based on date of hire. Thus, although under the CBA MaBSTOA employees may be treated similarly to TA employees in some respects, the crucial differences between MaBSTOA and TA employees are preserved.

Viewed in this context, the statutory prohibition of section 1203-a (3) (b) must be interpreted as follows: a MaBSTOA employee (even when driving on a TA route or working at a TA location) "shall not become . . . [an] employee[ ] of the . . . [TA] [for any purpose]" (such as hiring, promotion, suspension, or termination, because the TA employees are protected by civil service law) "and shall not acquire [the] civil service status" (merely by working in a TA job over time without taking a civil service exam).

This interpretation has the advantage of adhering to general principles of statutory construction. First, it is based on the ordinary understanding of words, and structure. (McKinney's Cons Laws of NY, Book 1, Statutes § 232 [words used in a statute are to be given their usual and commonly understood meaning].) It is also consistent with, and furthers, the statutory scheme and purpose. (*See e.g. Matter of Long v Adirondack Park Agency*, 76 NY2d 416 [1990] [necessary to give a statute sensible and practical overall construction which is consistent with and furthers its scheme and purpose and which harmonizes all its interlocking provisions].) Specifically, the foregoing inter-

---

fies the penalties that may be imposed for misconduct or incompetency, and limits the time within which a disciplinary proceeding may be commenced. (Civil Service Law § 75 [3], [4]).

pretation of the provision complies with the requirement that a statute must be interpreted consistent with the spirit and purpose underlying its enactment. (*See* McKinney's Cons Laws of NY, Book 1, Statutes §§ 96, 97, 98.)

In this case, the language of the Public Authorities Law indicates that the legislature anticipated that the functional overlap of the two entities would necessitate standardization and consolidation and granted them the authority to act accordingly. In creating MaBSTOA, the legislature granted it "all of the powers vested in the [TA] by section twelve hundred four of this title except those contained in [certain] subdivisions." (Public Authorities Law § 1203-a [3].) Under these subdivisions, the only power not granted to MaBSTOA with regard to employees is the power "[t]o appoint employees and fix their compensation subject to the provisions of the civil service law." (Public Authorities Law § 1204 [6].) Thus, MaBSTOA is authorized to "utilize business methods and efficient procedures" and to use TA employees and facilities. (*See* Public Authorities Law § 1203-a [3] [d], [e].) The statute also directs that the chairman and directors of the TA serve as directors of MaBSTOA. (Public Authorities Law § 1203-a [2].)

Both entities are required to "assist and cooperate with the [MTA] to carry out the powers of the [MTA] in furtherance of the purposes and powers of the authority as provided in this article." (*See* Public Authorities Law §§ 1204 [11]; 1203-a [3].) To that end, the TA and MaBSTOA are authorized "[t]o make or enter into contracts, agreements . . . necessary or convenient," and "[t]o exercise all requisite and necessary authority to manage . . . the maintenance and operation of transit facilities," and "[t]o do all things necessary or convenient to carry out [the] purposes [of MaBSTOA and TA] and for the exercise of [their] powers." (*See* Public Authorities Law §§ 1204 [11], [15], [17]; 1203-a [3].)

Second, the above interpretation renders the provision consistent with other provisions of the Public Authorities Law. The interpretation takes into account that there will be intermingling of personnel, but prohibits the granting of TA employment protections and benefits to MaBSTOA employees. Specifically, it is consistent with the provisions that require that TA employment be governed by the Civil Service Law in the areas of hiring, promotion, suspension and termination and that ensure that the only way to become an employee of the TA with all of the attendant benefits is to pass a civil service exam, and be placed on an eligibility list. (Public Authorities Law § 1210 [2] ["(t)he appointment, promotion and continuance of employ-

ment of all employees of the (TA) shall be governed by the provisions of the civil service law"].)

Finally, the foregoing interpretation adheres to the fundamental principle of statutory interpretation that "meaning and effect should be given to every word of a statute." (*Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95, 104 [2001]; *see* McKinney's Cons Laws of NY, Book 1, Statutes § 231.) Section 1203-a (3) (b), applicable to MaBSTOA employees, reads in relevant part that they "shall not become, for any purpose, employees of . . . the transit authority *and* shall not acquire civil service status *or* become members of the New York city employees' retirement system." To the extent that the statute prohibits three separate eventualities, the majority is right. However, it is only by interpreting the provision as applying to MaBSTOA employees who are working in TA positions or in TA territory that the provision makes sense in its entirety: It prohibits such MaBSTOA employees from (1) benefiting from civil service protections for "any purpose" (i.e., promotions, suspensions or terminations) by virtue of simply performing a TA job rather than because they have civil service status. Additionally, it prohibits MaBSTOA employees from (2) acquiring (that is from eventually gaining for themselves through their own actions and efforts) such "civil service status" merely by working in a TA position rather than passing a civil service exam, and (3) becoming members of NYCERS, and benefiting from a TA pension merely by working in TA jobs.

Thus, contrary to the majority's objection, this interpretation gives effect to every part of section 1203-a (3) (b). Indeed, it is the majority's interpretation that renders language in the statute "superfluous." If section 1203-a (3) (b) is interpreted as prohibiting MaBSTOA employees from acquiring any "qualities of being 'employed' by the TA," then the following prohibitions against acquiring civil service status and membership in NYCERS, which are hallmark qualities of TA employment, are redundant. As the majority itself points out, such an interpretation should be avoided. (McKinney's Cons Laws of NY, Book 1, Statutes § 231; *see Leader*, 97 NY2d at 104 ["words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning"]; *Matter of Branford House v Michetti*, 81 NY2d 681, 688 [1993].)

Moreover, in my view, the majority's interpretation creates unnecessary ambiguity. Although acknowledging that the statute "might be interpreted as encouraging some standardization," the majority finds that the statute prohibits such integration when it reaches a point where MaBSTOA employees have

become so integrated that they can "be seen as TA employees." Thus, rather than clarifying the level of integration, the majority's interpretation provides no guidance at all to the parties.

An impractical or unworkable interpretation is disfavored. (*See Matter of Long v Adirondack Park Agency*, 76 NY2d 416 [1990], *supra*; *People ex rel. Glick v Russell*, 181 App Div 322 [2d Dept 1917]; *Public Serv. Commn., Second Dist. v New York Cent. R.R. Co.*, 193 App Div 615 [3d Dept 1920], *affd* 230 NY 149 [1920]; *see also* McKinney's Cons Laws of NY, Book 1, Statutes §§ 141, 142, 144, 148.) Furthermore, nowhere in Public Authorities Law, article 5, title 9 is employment with the TA described in any terms other than by reference to civil service. (*See* Public Authorities Law § 1210 [2] [in the section entitled "Employees," describing TA employees as "governed by the provisions of the civil service law" without any reference to other "qualities" of employment].)

In construing a statute, it is well established that we "should consider the mischief sought to be remedied . . . , and . . . construe the act in question so as to suppress the evil and advance the remedy." (McKinney's Cons Laws of NY, Book 1, Statutes § 95.) In my opinion, section 1203-a (3) (b) seeks nothing more than to remedy the "mischief" of MaBSTOA non-civil service employees seeking TA civil service status as a result of the streamlining of the two entities' services and personnel. (*See e.g. Collins v Manhattan & Bronx Surface Tr. Operating Auth.*, 62 NY2d 361, 372 [1984] [MaBSTOA employee not entitled to be promoted pursuant to Civil Service Law merely because MaBSTOA "perform(s) functions in furtherance of governmental interests"].)

In my opinion, therefore, the job "picking" procedures negotiated, ratified and implemented in attachment E do not violate Public Authorities Law § 1203-a (3) (b), but on the contrary conform to the law by accomplishing the uniformity and standardization envisioned by the legislature while maintaining the statutorily mandated civil service distinction.